Filed 2/16/22  In re B.E. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re B.E., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. L.G., Defendant and Appellant. | G060781 (Super. Ct. No. 19DP0783) O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Jeremy D. Dolnick, Judge.  Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*        \*        \*

**INTRODUCTION**

L.G. (Mother) is the mother of B.E., who was taken into protective custody at the age of four. Mother appeals from the orders, entered in October 2021, denying her petition under Welfare and Institutions Code section 388 (further code references are to the Welfare and Institutions Code) and terminating her parental rights pursuant to section 366.26. B.E.'s father, A.E. (Father), did not appeal from the order terminating his parental rights. Mother contends the juvenile court violated her due process rights by denying her section 388 petition and terminating parental rights because, she claims, she had not been given adequate notice of the dependency proceedings.

We affirm. When B.E. was taken into protective custody, she was in Father's care and Mother's whereabouts were unknown. Orange County Social Services Agency (SSA) acted with due diligence in locating Mother and providing her notice: SSA conducted at least two reasonably thorough, systematic, and good faith investigations in an effort find Mother. Mother did not suffer a due process violation, and the juvenile court did not err by summarily denying her section 388 petition and thereafter terminating her parental rights.

**FACTS AND PROCEDURAL HISTORY**

**I. Protective Custody and Dependency Petition**

B.E., born in February 2015, was taken into protective custody on June 24, 2019, two days after Father was arrested for willful cruelty to a child, brandishing a weapon, kidnapping, and domestic violence. Father, after becoming intoxicated at a family party, threw B.E. into a car, which caused her to suffer an injury to her abdomen, forced his girlfriend of four years (F.C.) into the vehicle, and drove off down the street at speeds of up to 90 miles per hour. At one point, Father pulled the car to the side of the street and threatened F.C. with a knife.

B.E. was placed with paternal grandmother, K.A. (Paternal Grandmother), and remained in Paternal Grandmother's care throughout the dependency proceedings.

2

During the initial investigation, Paternal Grandmother informed SSA that B.E. had moved in with her in October 2018, Father had moved in a few months later, and Mother had not been in B.E.'s life since B.E. was a baby. Father informed SSA that Mother was "not in the child's life" and had not seen B.E. since B.E. was five days old: Mother had left B.E. in Father's care, he had sole custody of B.E., and Mother had had no contact with her. (SSA confirmed that Father had been granted sole custody of B.E. by a family court order in April 2018.) Neither Paternal Grandmother nor Father had contact information for Mother.

On June 26, 2019, SSA filed a dependency petition under section 300 subdivisions (a) (serious physical harm), (b)(1) (failure to protect), and (g) (no provision for support). A detention hearing was conducted on June 27, 2019. Father was present and his paternity status was elevated to presumed father. B.E. was ordered detained.

## II. SSA's June 2019 Investigation of Mother's Location

The whereabouts of Mother were unknown, and in June 2019, SSA conducted an investigation to locate her. SSA's investigation was described in a declaration of due diligence prepared by social worker Cynthia Santini of SSA's Absent Parent Search Unit and filed with the court on July 25, 2019. In conducting the investigation, Santini performed the following tasks:

1. Reviewed the absent parent search referral, the detention hearing report, and the dependency petition. The absent parent search referral identified Mother's last known address as the address of an apartment in Anaheim (the Anaheim address) and Mother's last known telephone number as (714) xxx-x830, which was associated with the Anaheim address.

2. Initiated clearances of the Orange County Jail Index system, the California Department of Corrections, and the Federal Bureau of Prisons. None had a record of Mother.

3. Initiated a clearance of the postmaster for the Anaheim address to determine if there was a forwarding address. The postmaster's response, dated July 12, 2019, was, "person listed above receives mail at address given."

4. Initiated a clearance of the California State Index for Medi-Cal cases. Its records showed Mother as having the Anaheim address.

5. Initiated a clearance of the Orange County Department of Child Support Services. Its records showed Mother having the Anaheim address and the (714) xxx-x830 telephone number.

6. Initiated a clearance of the California Department of Motor Vehicles. Its records showed Mother having an address in Garden Grove (the Garden Grove address).

7. Initiated a clearance of the postmaster for the Garden Grove address to determine if there was a forwarding address. The postmaster's response, dated July 9, 2019, was, "person listed above is not known at address given."

8. Initiated a clearance of the Child Welfare System/Case Management Services. Its records identified Mother as B.E.'s mother and as having the (714) xxx-x830 telephone number.

9. On June 28, 2019, sent a certified letter, return receipt requested, to both the Anaheim address and the Garden Grove address. The letters gave notice of the date, time, place, and purpose of the hearings scheduled for July 29 (pretrial) and August 12, 2019 (jurisdictional/dispositional). The letter sent to the Anaheim address was marked "unclaimed" and returned on July 16, 2019, while the letter sent to the Garden Grove address was marked "attempted not known" and returned on July 3, 2019.

10. Attempted to contact Mother on June 28, 2020 by calling her at (714) xxx-x830, the number on record with the Orange County Department of Child Support Services. A woman answered the phone and told Santini that she had the wrong number.

4

11. Spoke with Paternal Grandmother concerning Mother's whereabouts. Paternal Grandmother said she had not had any contact with Mother for three years and did not have an address or telephone number for her.

The assigned social worker also tried three times to contact Mother by calling the (714) xxx-x830 number, but each time the recipient would hang up upon answering the call.

Father had no contact information for Mother. In July 2019, he informed the assigned social worker that he did not learn that he was to become a father until he received a telephone call from Mother, from the hospital, informing him that she had given birth to his daughter, B.E. Father brought the newborn B.E. home from the hospital and took on the responsibility of being a single father because Mother was married, had a family of her own, and did not want B.E. Father had been granted sole physical custody of B.E. in April 2018, when she was three years old, and Mother had been granted visitation rights. Mother rarely visited B.E.; after two months she ceased following the visitation order and eventually stopped visiting B.E.

On August 12, 2019, at the jurisdictional/dispositional hearing, the juvenile court sustained the dependency petition as amended by interlineation, removed B.E. from parental custody, and granted Father reunification services. The court clerk mailed to Mother, at the Anaheim address, the minute order from the August 12 hearing, which provided the date of the six-month review hearing and notice of Mother's statutory rights.

### III. Efforts in January and July 2020 to Locate Mother

As of February 10, 2020, the date of the SSA status review report, Mother had not been located and she had not contacted SSA about the dependency proceedings. In January 2020, the assigned social worker conducted a search of Mother on VisionWeb and found no history of arrests or convictions. The assigned social worker also conducted a search of Mother on "CWS" (Child Welfare Services) which revealed an information-only child abuse report from November 2019 pertaining to Mother's other

5

child. That report provided a telephone number for Mother and gave the Garden Grove address as Mother's address. The social worker tried to contact Mother by calling that telephone number and mailing correspondence to the Garden Grove address, but Mother did not reply. The social worker again tried calling Mother at (714) xxx-x830 but was told by the call recipient that she had the wrong number.

Although B.E. had developmental delays, these were improving, and B.E. was described as "outgoing, talkative, and smiley." She no longer had the night tantrums she had suffered while transitioning to Paternal Grandmother's care. Father was inconsistent with visitation and minimally participated in reunification services; the juvenile court nevertheless continued Father's reunification services at the six-month review hearing on February 10, 2020.

In July 2020, the assigned social worker searched the Orange County Superior Court and child welfare databases in an attempt to locate Mother. There were no results.

B.E. continued to improve in speech and development, her tantrums decreased, and she remained an outgoing and happy child. Father's participation in his case plan continued to be minimal; he did not maintain regular contact with SSA and visited B.E. inconsistently.

### IV. SSA's December 2020 Investigation into Mother's Whereabouts and Mother's Appearance at Notice Review Hearing

On December 10, 2020, at the 12-month review hearing, the juvenile court terminated Father's reunification services and set a hearing under section 366.26. The court clerk mailed a copy of the court's minute order for that day and statutory writ forms to Mother at the Anaheim address.

In December 2020 and January 2021, SSA conducted another investigation in an attempt to locate Mother. SSA's investigation was described in a declaration of due

6

diligence prepared by social worker Gilbert Quintero of SSA's Absent Parent Search Unit and filed with the court on January 20, 2021. In conducting the investigation, Quintero performed the following tasks in December 2020 (unless dated otherwise):

1. Reviewed the Absent Parent Search Referral.

2. Initiated a clearance of the Missing Persons Index of the District Attorney's Office, Special Investigations Unit "to clear the name of [B.E.]" There was not a match.

3. Initiated a clearance of the Child Support Enforcement National Database. Its records showed Mother having the Anaheim address and the (714) xxx-x830 telephone number.

4. Initiated a clearance of the Child Welfare System/Case Management Services. Its records showed no address and the last known telephone number as (714) xxx-x830.

5. Initiated a clearance of the California State Index for Medi-Cal cases. Its records showed that Mother's last known address was the Anaheim address and Mother's last known telephone number as (714) xxx-x830.

6. Initiated a clearance of the California Department of Motor Vehicles. Its records showed that Mother's last known address was the Garden Grove address.

7. Initiated a clearance using the Thomson Reuters Clear search engine. Its records showed that Mother's last known address was the Anaheim address and contact telephone numbers of (951) xxx-x802, (714) xxx-x158, and (951) xxx-x867.

8. Tried to contact Mother on December 22, 2020 by calling the (714) xxx-x830 number. Quintero left a message for the recipient to call him.

9. Tried to contact Mother on December 22, 2020 by calling the (951) xxx-x802 number. A recording stated the voice mailbox was not set up.

10. Tried to contact Mother on December 22, 2020 by calling the (714) xxx-x158 number. A recording stated the number had been disconnected.

7

11.  Tried to contact Mother on December 22, 2020 by calling the (951) xxx-x867 number.  A recording stated the number had been disconnected.

12.  Initiated a clearance of the Orange County Jail Index System.  It had no record of Mother.

13.  Initiated a clearance of the California Department of Corrections.  It had no record of Mother.

14.  Initiated a clearance of the Federal Bureau of Prisons and Probation.  It had no record of Mother.

15.  On December 23, 2020, sent to Mother at the Anaheim address, by certified mail return receipt requested, a notice of hearing on selection of permanent plan, scheduled April 7, 2021.  On January 7, 2021, Quintero received an acknowledgment of receipt bearing an illegible signature.

16.  On December 23, 2020, initiated a clearance to the postmaster of the Anaheim address to determine if the post office had a forwarding address.  As of the date of the declaration of due diligence, Quintero had not received a response.

17.  On December 23, 2020, sent to Mother at the Garden Grove address, by certified mail return receipt requested, a notice of hearing on selection of permanent plan, scheduled April 7, 2021.  As of the date of the declaration of due diligence, Quintero had not received an acknowledgment of receipt.

18.  On December 23, 2020, initiated a clearance to the postmaster of the Garden Grove address to determine if the post office had a forwarding address.  As of the date of the declaration of due diligence, Quintero had not received a response.

19.  On January 14, 2021, again tried to contact Mother by calling the (714) xxx-x830 number.  Quintero left a message for the recipient to call him; he did not receive a response.

20.  On January 14, 2021, again tried to contact Mother by calling the (951) xxx-x802 number.  A recording stated the voice mailbox was not set up.

8

Mother appeared at a notice review hearing conducted on January 20, 2021. She was appointed counsel and granted supervised visitation with B.E. Mother submitted a notification of mailing address with an updated mailing address that was neither the Anaheim address nor the Garden Grove address and a telephone number that was none of the numbers known to SSA. Mother's counsel was served on January 20, 2021 with a notice of the section 366.26 hearing at which SSA would recommend termination of parental rights and implementation of a plan of adoption. Mother was personally served with notice of the section 366.26 hearing.

### V. Mother's Relationship with B.E.

When informed that Mother had been granted four hours per week of supervised visitation, Paternal Grandmother, who remained B.E.'s caretaker, expressed concern because Mother had "never wanted [B.E.]" and had not seen her in at least three years. Paternal Grandmother informed the social worker that B.E. viewed Father's live-in girlfriend, Lo., as her mother. Several days later, the social worker met with B.E. by videoconference "in an effort to gauge the child's perception of a maternal figure." The social worker asked B.E. about the people she lived with and the important people in her life. B.E. identified Father as her father, and, when asked who was her mother, replied, "'L[o.] and my grandma.'" B.E. was shown a photograph of Mother but did not recognize her.

On January 26, 2021, the assigned social worker spoke with Mother and asked her why she had not presented herself to SSA sooner. Mother claimed she had not received any prior notices but confirmed the Anaheim address was in fact her prior mailing address. When asked if she had ever tried to find B.E., Mother replied, "'I was just being patient because her dad told me he would bring her to me.'" Mother added: "'We've talked and seen each other. He will tell me I'll bring her, be patient. He hasn't called me since the hearing and he told me not to worry about the court hearing, it's a mistake.'" Mother admitted that she had not seen B.E. for about two years.

9

Paternal Grandmother and step-grandfather were committed to adopting B.E., who was now five years old, and to raise her to adulthood. The social worker described B.E. as "a sweet five-year-old girl" who "exhibits no medical, developmental, or behavioral concerns" and found her to be both generally and specifically adoptable.

Mother had virtual visits with B.E. at least through April 2021. The social worked asked B.E. if Mother is "nice" and B.E. replied "[y]es." B.E. described how she and Mother colored, played blocks and Lego's, and made pictures with stickers.

In July 2021, B.E. again told the social worker that Lo. and Paternal Grandmother were her mother. The social worker explained to B.E. that Mother was also her mother and that "[Mother] only wanted to get to know her as she is such a special girl and that more love is a good thing." On hearing those words, B.E. slouched in her chair, covered her face, and sobbed for 10 minutes. After calming B.E. down, the social worker asked her how she was feeling. B.E. replied: "'Mad. Why does she have to be my mom. I don't want her to be my mom.'"

B.E. did not want to participate in another visit with Mother in July 2021 and again said "'I don't want her to be my mom.'" B.E. had a reasonably pleasant video visit with Mother on September 15, 2021, but Paternal Grandmother reported that B.E. "is not taking it too well" that Mother is her mother and that B.E. does not want to talk about the subject. In September 2021, B.E.'s therapist noted that B.E. refused to acknowledge Mother as her mother.

## VI. Mother's Petition Under Section 388

In May 2021, Mother filed a petition under section 388 to vacate all jurisdictional and dispositional findings and orders and to "[s]tart de novo with arraignment on the [dependency] petition" on the ground that Mother had not received notice of the hearings. Submitted with the petition was a declaration from Mother, who claimed she had not received notice of the detention hearing, pretrial hearing, and trial, and denied living at the Anaheim address or the Garden Grove address in June and July

10

of 2019, when notice of those hearings was given. Mother declared that she lived with Father and B.E. from March to the beginning of June 2019 and, after that, "[F]ather has always had my contact information and a way to contact me."

The assigned social worker discussed Mother's section 388 petition with Father on the day it was filed. Father stated that Mother had "dropped off" after he was granted sole custody of B.E., when B.E. was two and a half or three years old. Father denied keeping Mother away from B.E.; Mother knew where to find B.E. but "never wanted her." Father denied having had any contact with Mother during the course of the dependency proceedings and denied having any contact information for her: Father had made the same denials several times during the dependency case. Father opposed reunification services for Mother because she had never wanted B.E. in her life, B.E. did not know her, and Paternal Grandmother was the only mother B.E. had ever known.

In an interim review report dated July 6, 2021, the assigned social worker made the comment that even if Mother did not reside at the Anaheim address, she did receive her mail there. Notice of the section 366.26 hearing had been sent by certified mail to the Anaheim address, a signed letter receipt was received by the SSA search unit, and Mother appeared at the notice review hearing on January 20, 2021. The maternal grandmother still resided at the Anaheim address. The social worker also commented that the Garden Grove address was listed as Mother's address in the information-only child abuse report concerning Mother's other child.

## VII. Denial of Mother's Section 388 Petition and Termination of Parental Rights

The juvenile court conducted a hearing on Mother's section 388 petition on October 12, 2021. The court took the matter under submission and two days later issued a ruling to deny the petition without an evidentiary hearing. The court gave an extended analysis of legal authority and made lengthy findings on the record. The court found that SSA had exercised due diligence and acted in good faith in its efforts to locate Mother,

11

SSA's efforts to find Mother were "more than adequate," and Father did not have contact information for Mother. SSA was not required to send a social worker to the Anaheim address or the Garden Grove address, because, the court found, "[t]here is no requirement that S.S.A. stake out every possible address in hopes of successfully reaching a parent."

The court found Mother's declaration submitted with the section 388 petition to be not credible. In reference to Mother's claim that she had resided with Father and B.E. from March to June 2019, the court questioned why Mother had made no effort to contact B.E. if she had indeed been living with Father and B.E. so close in time to the dependency case. The court found that Mother had made no attempt to account for her whereabouts between June 2019 and her appearance at the notice review hearing in January 2021: "As far as the court's evidence goes, [Mother] has made no effort or made no accounting of where she's been and what she's been doing." The court also found that Mother's declaration about living with Father was inconsistent with statements made by Father throughout the dependency proceedings and statements made by Father's ex-girlfriend (F.C.), who told police she had been in a relationship with Father for four years as of the time the dependency proceedings commenced.

The juvenile court also addressed Mother's statements to the social worker that Mother was being patient and waiting for Father to bring B.E. to her. The court stated: "[Mother] also made a statement that she was just being patient because [Father] said he would bring [B.E.] to her. [Mother] also said she had talked to [Father], and [Father] kept telling her to be patient. [Father] told mom not to worry about the court hearing, it was a mistake. [¶] The statements indicated that [Mother] was aware that there was some type of proceeding taking place, and [Mother] did nothing about it. [¶] [Mother] indicated that she would have jumped at the first chance had she known that these proceedings were taking place, but appeared to have sat on her rights until she realized that her parental rights were about to be terminated. [¶] The court has no

12

understanding of why [Mother] would simply rely on the word of [Father], when she really had no reason to trust him."

The juvenile court found that B.E.'s best interest would not be served by granting Mother the relief she requested in the section 388 petition. The court referred to passages in SSA reports reporting that B.E. considered Lo. and Paternal Grandmother to be her mother, reacted negatively to being told Mother was her mother, refused visits with Mother, and did not wish to discuss the topic of Mother.

After denying Mother's section 388 petition, the juvenile court turned to the section 366.26 hearing. After hearing argument from counsel, the court terminated parental rights and ordered adoption as the permanent plan.

## DISCUSSION

### I. Relevant Law and Standard of Review

"A section 388 petition is the appropriate method for raising a due process challenge based on lack of notice." (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711.) A juvenile court may summarily deny a section 388 petition if the petition, liberally construed, fails to make a prima facie showing that (1) a change of circumstances or new evidence might require an order to be changed and (2) the requested change would be in the child's best interest. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-189.) Thus, to warrant an evidentiary hearing, the parent must make a prima facie showing of *both* a change in circumstances or new evidence *and* the promotion of the child's best interests. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157.) In determining whether the section 388 petition makes a prima facie showing, the juvenile court may consider the entire factual and procedural history of the case. (*In re Justice P., supra*, at p. 189.)

We review a juvenile court's summary denial of a section 388 petition under the abuse of discretion standard. (*In re Daniel F., supra*, 64 Cal.App.5th at p. 711.) We view the evidence in a light most favorable to the juvenile court's order and draw all reasonable inferences to uphold it. (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483;

13

*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 70.) We defer to the juvenile court's assessment of witness credibility and resolution of conflicts in the evidence. (*In re Cole Y.* (2015) 233 Cal.App.4th 1444, 1453; *In re Maya L.* (2014) 232 Cal.App.4th 81, 104, fn. 6.)

Notwithstanding the abuse of discretion standard generally applicable to an order denying a section 388 petition, the de novo standard of review is applied to a mixed question of fact and law that implicates a constitutional right. (*People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 76; *In re J.H.* (2007) 158 Cal.App.4th 174, 183 ["Constitutional issues are reviewed de novo"].)

"In juvenile dependency proceedings, due process requires parents be given notice that is reasonably calculated to advise them an action is pending and afford them an opportunity to defend." (*In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1114.) The due process requirement of notice means that the child welfare agency must act diligently to locate a missing parent. (*In re Justice P., supra*, 123 Cal.App.4th at p. 188.) "Reasonable diligence denotes a thorough, systematic investigation and an inquiry conducted in good faith." (*Ibid.*) "[T]here is no due process violation when there has been a good faith attempt to provide notice to a parent who is transient and whose whereabouts are unknown for the majority of the proceedings." (*Ibid.*)

"It is not always possible to litigate a dependency case with all parties present. The law recognizes this and requires only reasonable efforts to search for and notice missing parents. Where reasonable efforts have been made, a dependency case properly proceeds. If a missing parent later surfaces, it does not automatically follow that the best interests of the child will be promoted by going back to square one and relitigating the case. Children need stability and permanence in their lives, not protracted legal proceedings that prolong uncertainty for them." (*In re Justice P., supra*, 123 Cal.App.4th at p. 191.)

14

## II. SSA Acted With Reasonable Diligence to Locate
## Mother and Provide Her Notice of
## the Dependency Proceedings

A. *SSA's Efforts to Locate Mother*

In the present case, SSA conducted at least two thorough, systematic, and good faith investigations into Mother's whereabouts. SSA's efforts are recited in detail in the declarations of due diligence filed in July 2019 and in January 2021.

In June 2019, social worker Santini initiated clearances with seven federal, state, and local government agencies. The California State Index for Medi-Cal cases showed Mother as having the Anaheim address; the Orange County Department of Child Support Services showed Mother as having the Anaheim address and the (714) xxx-x830 telephone number; the Child Welfare System/Case Management Services showed Mother as having the (714) xxx-x830 telephone number; and the California Department of Motor Vehicles showed Mother as having the Garden Grove address. Notice was sent by certified mail, return receipt requested, to the Anaheim address and the Garden Grove address. Postmasters were contacted. The Anaheim postmaster confirmed that Mother was receiving mail at the Anaheim address. Santini called the (714) xxx-x830 and the assigned social worker did so three times. Santini spoke with Paternal Grandmother, who said she had no contact information for Mother. Father denied having contact information for Mother.

In December 2020, social worker Quintero conducted an investigation virtually identical to the one conducted in June 2019 and added a search using the Thomson Reuters Clear search engine. Nothing new was uncovered except for a few more possible telephone numbers. Quintero called the (714) xxx-x830 number and other numbers uncovered by his investigation.

In addition, in January 2020, midway between the June 2019 investigation and the December 2020 investigation, the assigned social worker conducted database searches and found a child abuse report from November 2019 giving the Garden Grove

15

address as Mother's address and providing a telephone number for Mother. The social worker tried to contact Mother by calling the telephone number provided and mailing correspondence to the Garden Grove address, but Mother did not reply. The social worker again tried calling Mother at (714) xxx-x830 but was told by the call recipient that she had the wrong number. In July 2020, the assigned social worker again checked the Orange County Superior Court and Child Welfare Services databases and found no history of arrests or convictions or new child abuse investigations.

Mother was served at the Anaheim address with the dependency petition, notice of the jurisdictional/dispositional hearing, the minute order issued at the detention hearing (which noted the date of the six-month review hearing), and a notice of Mother's statutory rights. She was given notice by certified letter sent to both the Anaheim address and the Garden Grove address of the date, time, place, and purpose of the jurisdictional/dispositional hearing. The notice of the six-month review hearing was served on Mother at the Garden Grove address, which at the time appeared to be her last known address. Mother was served, by certified mail return receipt requested, at both the Anaheim address and the Garden Grove address, with the notice of hearing on the section 366.26 hearing.

B. *What More Could or Should SSA Have Done?*

Mother claims that SSA uncovered a telephone number for her in the course of the June 2019 investigation but did not call that number until December 2020. Mother's citations to the record reveal that the telephone number she is referring to is the (714) xxx-x830 number. Santini, Quintero, and the assigned social worker called that number many times between June 2019 and December 2020 without success: The person answering the calls hung up, and messages were not returned.

Mother claims that SSA, in addition to conducting database searches, should have pursued specific avenues most likely to yield her address. What those avenues were Mother does not say. SSA searched a large number of databases including

16

several (for example, the Orange County Department of Child Support Services) that were the sources most likely to yield Mother's current contact information. Further, since Mother has never identified where she lived or received mail after May 2019, it cannot be determined what other sources SSA might have checked to learn of her whereabouts.

Mother claims that Father and Paternal Grandmother were not credible in denying having had contact with Mother and that SSA should have pressed them for more information. The juvenile court found otherwise, and we accept the juvenile court's assessment of credibility. Mother asserted in her declaration submitted with her section 388 petition that after June 2019 Father had her contact information and thus knew how to contact her. That assertion lacks foundation and, more significantly, Mother never reveals where she could have been contacted. Mother has never, not in the juvenile court or before us, provided the telephone number or address where she lived or received mail after the beginning of June 2019.

Mother contends that SSA should have sent someone out to the Anaheim address to make contact with her or at least to leave a business card. But such an endeavor would have been futile if Mother were not residing at the Anaheim address. If Mother were residing at the Anaheim address, or using it as her mailing address, then she would have received the notices sent to that address by certified mail and it would have been unnecessary for SSA to undertake additional action. Moreover, there is no reason to believe that Mother would have paid any more attention to a business card than she did to the notices sent by certified mail. SSA is required only to make a reasonably diligent search, not expend its limited resources in a game of cat and mouse.

Mother faults SSA for making "no effort" to serve her with notice of the 12-month review hearing; this failure, Mother argues, demonstrates that SSA did not undertake diligent efforts to find her. We agree with *In re A.D.* (2011) 196 Cal.App.4th 1319 that failure to serve a parent with notice of a 12-month review hearing is not

17

structural error requiring automatic reversal, but is subject to a harmless error analysis when prejudice can be determined without speculation. (*Id.* at pp. 1326-1327.) We can conclude without resorting to speculation that any error in failing to serve Mother with notice of the 12-month review hearing was harmless. Section 293 requires that a notice of review hearing be given to a parent at the parent's last known address. (§ 293, subd. (e).) In July 2020, when notice was given of the 12-month review hearing, Mother's last known address (according to the November 2019 information-only child abuse report) was the Garden Grove address. A certified letter to Mother sent to that address in June 2019 had been returned as "attempted not known," and nowhere in the appellate record or in her appellate briefs has Mother claimed she would have received notice mailed to the Garden Grove address.

Mother apparently contends she should have been served with notice of the 12-month review hearing at the Anaheim address because, she claims, it was the home of the maternal grandmother. But SSA was not required to effect alternate notice by service on maternal grandmother for the 12-month review hearing, as it would have been required to do for a permanency hearing under section 366.26. (See § 294, subd. (a)(7) [grandparents must be given notice of a section 366.26 hearing if a parent's whereabouts are unknown].) Mother had been called many times at the (714) xxx-x830 number—which Mother tacitly admits was her telephone number—but calls were rejected and messages were not answered.

The juvenile court, whose credibility determinations we accept, found that Mother never made any accounting of where she lived or what she had been doing, knew of the dependency proceedings, and decided not to participate in them. It was Mother's own choice, not the lack of notice, that caused her to be absent from the dependency proceedings: As the trial court found, Mother was aware of the dependency proceedings but "did nothing about it."

18

Viewing the facts as found by the juvenile court, and accepting its credibility determinations, we conclude that Mother did not suffer a due process violation and, in the case of the 12-month review hearing, any failure to provide notice was harmless. SSA acted diligently and in good faith to locate Mother, whose whereabouts during the relevant timeframes she has never disclosed, and to give her notice of the dependency proceedings. SSA own assessment of its efforts to find Mother is on the mark: "Not only were SSA's efforts diligent by any measure, they in fact resulted in Mother's appearance, and these efforts were coupled with a reasonable conclusion that Mother knew about these proceedings earlier than she would have had the court believe."

The juvenile court therefore did not err by summarily denying Mother's section 388 petition on the ground that Mother had failed to make a prima facie showing of changed circumstances or new evidence requiring new or changed orders. Because Mother did not make a prima facie showing of changed circumstances or new evidence, the juvenile court did not need to find, and we do not consider, whether Mother made a prima facie showing that the requested changes and revocations of the orders issued in this matter would have been in B.E.'s best interests. (See *In re G.B., supra*, 227 Cal.App.4th at p. 1157.)

Mother challenges the order terminating parental rights solely on the ground the juvenile court should have granted her section 388 petition and vacated all orders in these proceedings. As we are affirming the order denying Mother's section 388 petition, we affirm the order terminating parental rights too.

## DISPOSITION

The order denying Mother's section 388 petition and the order terminating parental rights are affirmed.

FYBEL, J.

WE CONCUR:

MOORE, ACTING P. J.

ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.